UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DORIS J. THOMPSON,       )
                              )
      Plaintiff,        )
                              )
      vs.              )   Case No. 4:05CV1949 CDP
                              )
MICHAEL J. ASTRUE,[1]     )
Commissioner of Social Security,  )
                              )
      Defendant.      )

## <u>MEMORANDUM AND ORDER</u>

This is an action for judicial review of the Commissioner's decision denying

Doris Thompson's two applications for benefits under the Social Security Act.

The first application is for disability insurance benefits under Title II of the Act,

42 U.S.C. §§ 401, <u>et seq.</u>  The second application is for supplemental security

income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§

1381, <u>et seq.</u>  Section 205(g) of the Act, 42 U.S.C. §§ 405(g), provides for judicial

review of a final decision of the Commissioner under Title II, and Section

1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Astrue should be substituted for Commissioner Jo Anne B. Barnhart as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

final decision under Title XVI.  Thompson claims that she is disabled because she has blood clots in the leg, high blood pressure, headaches, memory loss, history of brain aneurysm, impaired neck and back, and depression.  The Administrative Law Judge (ALJ), however, found that Thompson was not disabled.  Because I find that the decision denying benefits was not supported by substantial evidence, I will reverse and remand for further proceedings.

## Procedural History

Thompson filed her applications for disability benefits under Title II on January 31, 2003, and under Title XVI on January 27, 2003.  Thompson's applications were denied initially.[2]  On November 26, 2004, following a hearing, the ALJ issued a decision that Thompson was not disabled.  The Appeals Council of the Social Security Administration (SSA) denied her request for review on August 26, 2005.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[2]Missouri is one of several test states participating in modifications of the disability determination procedures applicable to this case.  See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2001).  These modifications include the elimination of the reconsideration step and, in some cases, the Appeals Council review step in the administrative appeals process.  See id. Therefore, plaintiff's appeal in this case proceeded directly from her initial denial to the ALJ level.

## Evidence Before the Administrative Law Judge

### Testimony

Thompson was born on March 17, 1951, in Arkansas, but she does not know in what city.  She is about five feet, four inches tall and weighed about 140 pounds at the time of the hearing.  Although Thompson is still married, she has been estranged from her husband for many years.  Thompson has two sons who live in St. Louis, one son who lives in Los Angeles, and one deceased son.  At the time of the hearing, Thompson was living with her stepbrother because she had been evicted from her own apartment.

Thompson believes that she completed her junior year of high school, but she does not remember what school she attended or whether she obtained her GED.  Thompson was a bus driver at one point in her life, but she does not how long she worked at that job.  Thompson stopped working as a bus driver in 1994 because she had surgery on her head, which she said hurt "real bad."  Thompson testified that her head continues to hurt "pretty often" and that it "burns like fire or something."  Thompson has a throbbing, burning pain in her head when she wakes up, and she stated that a doctor told her it was migraine clusters.  Thompson takes medication for her head which relieves the symptoms somewhat, but the medicine makes her dizzy, sleepy and shaky.  She testified that her legs "just stop, they just

go down," and that she has problems with her balance and falls often.

Thompson often has problems with her memory and cannot remember people she knew when she was younger. She had been seeing a neurologist, Dr. Leacock, regularly for headaches and memory loss, but since he moved she found another neurologist. At the time of the hearing, Thompson had an appointment to see the new neurologist in a couple of months. Thompson also saw a regular physician, Dr. Randolph. Thompson stated that she has problems with her back and neck. She claims that her back hurt after she was given a spinal tap, and that it is difficult for her to get up, walk, and stand. Dr. Randolph prescribes Thompson pain medication for her back. Thompson had surgery for blood clots in her right leg and was later evaluated for a knot on her left leg. She testified that her legs ache constantly, so she sometimes rubs cream on them.

Thompson has high blood pressure and takes medication prescribed by Dr. Randolph. Thompson testified that her blood pressure has come down recently since she has been taking a new medication, but it makes her thirsty and groggy. Thompson also said she has trouble sleeping. Her pain medication helps her sleep, but she gets diarrhea, nauseated and thirsty when she takes it.

Thompson stated that she is depressed from losing her apartment and her job, and from the deaths of her son and her brother. Thompson also testified that

she is depressed because people "pick at her" and "work her nerves." She cries frequently.

As far as her daily activities, Thompson showers herself and puts on her own clothes. When asked if she made her own bed, Thompson replied that she "pull[s] the cover on it." She microwaves her own meals, but said that she drops things and cuts and burns herself if she tries to cook. Thompson washes dishes "a little," but her chest hurts and burns because of her last two breast surgeries. Thompson does not do much housework because bending and stooping make her dizzy and hurt her back. She stated that she might fold up her clothes or "put some dirt on a plant," but she does not wash her own clothes or pick anything up. Thompson has to take a break when walking up stairs because she gets tired and her chest starts beating fast. She has trouble carrying things and said that she can only carry "some towels or maybe a couple of sheets, but not a lot." Thompson owns a car, but it does not run. Thompson goes shopping, but she needs someone else to drive her and carry her heavy packages. She testified that she cannot walk very far, and that she needs to take water with her and rest if she walks to her mailbox and back. Thompson estimated that she can only stand for about five minutes.

Thompson does not belong to any social organizations. Thompson's aunt

takes her to church once or twice a month, but she cannot stay for the entire service because the benches are too hard. Thompson does not ride Metro Link because she "doesn't like being up high," and she does not take the bus by herself because she forgets where she is going. On a typical day, Thompson gets up, has something to drink, and then takes her medicine. She testified, "And when I feel kind of good, I go outside and maybe water the grass. Then back in the house pretty much, unless my sister or somebody comes by, and I go over to their house for a little while, or my son will get me and take me to see the grandkids." She was not exercising at the time of the hearing, but she was trying to get enrolled in water aerobics.

Upon questioning by the ALJ, Thompson stated that she goes down into the basement maybe three times a day to get clothes. Once in the basement, she stays there awhile. No vocational expert was presented.

Medical Records

On April 22, 2003, Thompson was administered a psychological evaluation by Robert Harris, PH.D., a consultative evaluator, at Community Psychological Service. The DSM-IV Diagnostic Impression was as follows: Axis I - major depression disorder, chronic to moderate severity; Axis II - diagnosis deferred; Axis III - see medical records; Axis IV - economic problems, housing problems;

and, Axis V - GAF of 50.  The report concluded that "Thompson does suffer from some memory, attention, and concentration deficits.  However, her variable effort and negativistic response set made it difficult to discern her level of impairment."

In connection with his evaluation, Harris also administered WMS III testing. Thompson scored extremely low in the categories of visual delayed memory, general memory, and working memory.  She scored borderline in the categories of auditory immediate memory, immediate memory, and auditory delayed memory, and was rated low average in the visual immediate and the auditory recognition delayed memory categories.

On May 9, 2003, Thompson was seen by R. Cottone, Ph.D., a state psychiatrist, for a psychiatric review.  Cottone noted that Thompson showed signs of affective disorder, specifically, depressive syndrome characterized by appetite disturbance with a change in her weight, sleep disturbance, and difficulty concentrating.  Thompson was also noted to have somatoform disorder in the form of a pain disorder.  Cottone also rated Thompson's functional limitations.  He found her to have a moderate degree of limitation in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  It was noted that Thompson had one or two episodes of decompensation, each of extended duration, and that she had a history of head surgery for a left

middle cerebral artery aneurysm. Thompson's effort during the examination was noted as inconsistent and variable. Cottone's report notes that Thompson has an oppositional disposition which accounts for a portion of her poor performance rather than just memory problems per se. Although Cottone could not rule out malingering, he noted that Thompson is forgetful and should be limited to simple work. Cottone concluded that some restriction in work-related social interaction was necessary for Thompson.

On May 12, 2003, Thompson saw Bruce Donelly, M.D. for a physical residual functional capacity assessment. Donelly reported Thompson's exertional limitations as follows: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of six hours in an eight hour workday; sit for about six hours in an eight hour workday; and, unlimited in her ability to push and/or pull. Donelly found no limitations in the areas of posture, manipulation, vision, communication, or environment.

In September of 1997, Thompson underwent a colonoscopy at Christian Hospital Northeast/Northwest, which revealed the presence of internal hemorrhoids. A biopsy taken from her ascending colon at the same time confirmed that Thompson had colonic mercosa with mild to moderate non-specific chronic inflammation. In July of the same year, a panendoscopy had revealed that

Thompson suffered from mild gastritis and reflux esophagitis. A second panendoscopy with biopsy taken at DePaul Health Center on July 24, 2000, showed no change in this diagnosis. Thompson had another colonoscopy with biopsy performed at DePaul Health Center on February 20, 2001. The results of that colonoscopy showed polyps within the sigmoid colon and internal hemorrhoids with acute and chronic interstitial inflammation. The next month, an x-ray of Thompson's pelvis performed at Christian Hospital Northeast/Northwest showed the presence of multiple heterogeneously hypoechoic lesions.

Between 2002 and 2004, Thompson was seen by her regular treating physician, Bernard C. Randolph, M.D. for headaches, dizziness, backaches, "fullness" in her chest, nausea, intra cranial aneurysm, gastroesophageal reflux, DVT in her right leg, and breast cysts. Thompson was diagnosed with intra cranial aneurysm status/ post craniotomy, HCVD, BERD, DJD of her lumbar spine, fibrocystic disease, chronic anxiety, and depression.

On January 25, 2002, Thompson underwent a venous duplex scan of the left lower extremity at DePaul Health Center. Thomas Charles, M.D. found no evidence of an acute deep vein thrombosis in any of the major veins of the left lower extremity, but he believed that Thompson had a caustic structure or hematoma in the left popliteal fossa. An x-ray confirmed a baker's cyst in the left

popliteal fossa.  Five days later, Thompson was evaluated by Robyn Hithcoch, Sr., who diagnosed her with dyspepsia, artery disease, hypertension, hypercholesterolemia, and history of colon polyps.

On March 22, 2002, Thompson went to Forest Park Hospital for a CT of her head.   The CT results were highly suggestive of a left middle cerebral artery trifurcation aneurysm.  The physician's report notes that Thompson had a prior craniotomy for repair to an aneurysm.

On April 3, 2002, a mammogram comparison was performed at Forest Park Hospital.  No evidence of malignancy was detected.

On April 29, 2002, Thompson saw Rodney Leacock, M.D., a neurologist at SLUCare, for evaluation of headaches, memory loss, and intracranial aneurysm. Upon examination, Leacock reported that Thompson was alert and oriented, that her cognition was slow, and that her speech was good.  He also administered a mini-mental status examination and reported Thompson's results as 27-28/30. Leacock also noted that Thompson had difficulty copying a figure, recalling the governor of the state and some difficulty with naming the building.  Leacock diagnosed Thompson with "cognitive slowing and memory loss," and noted the possibility of hydrocephalus, recurrent aneurysm, temporal arteritis, intracerebral hemorrhage, and tumor given her status of post aneurysm surgery.

On September 27, 2002, Thompson was seen by SLUCare, where she was noted to have problems with hypertension, acid reflux disease, depression, and headaches.

On January 21, 2003, Thompson had a CT of her lumbar spine performed at Forest Park Hospital revealing minimal hypertrophic changes at L3-L4, bilateral renal calculi, and inferior vena caval filter, and vascular calcification of the lower abdominal aorta without eneursymal dilation.

On April 15, 2003, Thompson went to the SLUCare Neurology Department complaining of headaches, depression, and chronic pain.

### Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000) (quoting <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

<u>Brand v. Secretary of Dep't of Health, Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the national

economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R.

404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is

never free to ignore the subjective testimony of the plaintiff, even if it is

uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d

1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole. See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the

subjective complaints, the ALJ is required to consider the factors set out by

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters
> as: (1) the objective medical evidence; (2) the subjective
> evidence of the duration, frequency, and intensity of plaintiff's
> pain; (3) any precipitating or aggravating factors; (4) the
> claimant's daily activities; (5) the dosage, effectiveness and
> side effects of any medication; and (6) the claimant's functional
> restrictions.

Id. at 1322.

A treating physician's opinion should not ordinarily be disregarded and is

entitled to substantial weight.  <u>Singh</u>, 222 F.3d at 451.  A treating physician's opinion concerning a claimant's impairment will be granted controlling weight, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  <u>Id.</u>  While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically control, since the record must be evaluated as a whole."  <u>Prosch v. Apfel</u>, 201 F.3d at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "are supported by better or more thorough medical evidence" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions.  <u>Id.</u> (quoting <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997)).  In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion.  <u>Singh</u>, 222 F.3d at 452; <u>Prosch</u>, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

# The ALJ's Findings

The ALJ issued his decision that Thompson was not disabled on November 26, 2004. The ALJ made the following findings:

1. The claimant is insured for a Period of Disability and Disability Insurance Benefits throughout the period of this decision.

2. The claimant has not engaged in substantial gainful activity since April 1, 2002, the day after the date her Social Security benefits terminated. 20 C.F.R. §§ 404.1520(b), 416.920(b).

3. The claimant has been more than minimally limited by brain aneurysm residuals, degenerative lumbar disease, a major depressive disorder and a pain disorder and headaches. 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, she satisfies the requirement for a severe impairment.

4. The claimant's condition has not met or medically equaled a listing in 20 C.F.R. pt. 404, subpt. P. app. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d).

5. The claimant's allegations are not credible. Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984); 20 C.F.R. §§ 404.1529, 416.929.

6. Since April 1, 2002, the claimant has had the residual functional capacity to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, and stand or walk a total of six hours in an eight-hour day. She has also been able to understand, remember and carry out simple instructions, respond appropriately to supervisors, co-workers and usual work situations, and deal with changes in a routine setting. 20 C.F.R. §§ 404.1567, 416.967.

7.  The claimant has been unable to perform her past relevant work since April 1, 2002.  20 C.F.R. §§ 404.1520(e), 416.920(e).

8.  The claimant is a person approaching advanced age.  20 C.F.R. §§ 404.1563, 416.963.

9.  The claimant has a limited education.  20 C.F.R. §§ 404.1564, 416.964.

10. The claimant has been able to perform work existing in significant numbers in the national economy since April 1, 2002.  20 C.F.R. §§ 404.1520(f), 416.920(f).  This finding is based on Medical-Vocational Rule 202.11 of 20 C.F.R. pt. 404. subpt. P., app. 2, Table No. 2, and Social Security Ruling 85-15.

11. The claimant has not been disabled as defined in the Social Security Act since April 1, 2002.  Thus, she is not entitled to, or eligible for, a Period of Disability, Disability Insurance Benefits or Supplemental Security Income.

The ALJ discredited Thompson's allegations of disability.  He concluded that Thompson was not credible because he found her testimony about her daily activities to be inconsistent with her asserted limitations.  He also discounted Thompson's testimony about the intensity and frequency of her symptoms because her primary analgesic was an over-the-counter medication (Naproxen) and she did not seek mental health treatment.

The ALJ also found that the medical evidence did not support a finding that Thompson is disabled.  In support of this conclusion, he relied on the state

physician's assessment that Thompson had no manipulative or environmental limitations, and that she could lift, carry, push or pull twenty pounds occasionally and ten pounds frequently, and sit or stand and walk for six hours in an eight-hour day. The ALJ also found no medical evidence of a mental impairment, citing her treating physician's mini-mental status examination of Thompson in April of 2002. The ALJ gave only minimal weight to the opinions of Harris (a consultative examiner) about Thompson's mental state because his report noted that her variable effort and negativism made it difficult to discern the level of impairment. He also discounted the report from the state psychologist, Cottone, because the ALJ believed that he "essentially relied" on Harris's report to find that Thompson had moderate limitations in numerous mental arenas. The ALJ therefore concluded that Thompson had no restrictions of daily living, no difficulties maintaining social functioning, no episodes of decompensation, and only mild-to-moderate difficulties maintaining concentration, persistence, and pace.

After defining Thompson's residual functional capacity, the ALJ decided that Thompson was unable to perform her past relevant work as a bus driver given her limitations. Therefore, the ALJ acknowledged that the Commissioner was required to demonstrate that Thompson could perform other work. Given her advanced age, limited education, functional capacity, and vocational background,

the ALJ determined that Thompson was able to perform work existing on significant numbers in the national economy since April of 2002. This finding was not based on the testimony of a vocational expert. Instead, the ALJ relied upon Medical-Vocational Rule 202.11 of 20 C.F.R. pt. 404, subpt. P, app. 2, Table No. 2. By way of administrative notice, the rule establishes that a significant number of jobs exist in the national economy. The ALJ's decision notes that "although the rule is not squarely on point because of the claimant's mental capacity, Social Security Ruling 85-15 advises that the ability to understand, remember and carry out simple instructions, deal with changes in a routine setting, and respond appropriately to supervisors, co-workers, and usual work situations is sufficient to meet the demands of competitive, remunerative unskilled work." For these reasons, the ALJ determined that Thompson was not disabled and denied her application for benefits.

## Discussion

On appeal, Thompson contends the ALJ erred by failing to properly evaluate her subjective complaints of pain, present testimony from a vocational expert, and order additional psychological evaluation of Thompson. In response, the Commissioner maintains that the ALJ properly assessed Thompson's credibility, correctly determined her residual functional capacity without an

additional consultative examination and properly decided that Thompson can perform other work in the national economy without the testimony of a vocational expert.

I find that the ALJ improperly evaluated Thompson's testimony under the standards set forth in Polaski, 739 F.2d 1320. Although the ALJ may discount a claimant's subjective complaints, he may not do so on the sole ground that those complaints are not fully supported by the objective medical evidence. Jeffrey v. Secretary of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Battles, 902 F.2d at 660. Thus, in assessing subjective allegations, the ALJ may consider the frequency and type of the claimant's medication or treatment, the claimant's daily activities, and the claimant's appearance and demeanor at the hearing. Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in Polaski. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); Cline v. Sullivan, 939 F.2d 560, 565

(8th Cir. 1991).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence.  <u>Jeffrey</u>, 849 F.2d at 1132; <u>Butler v. Secretary of Health & Human Servs.</u>, 850 F.2d 425, 429 (8th Cir. 1988).

The ALJ improperly discredited Thompson's testimony by erroneously finding that her claims of disabling symptoms conflicted with the medical evidence and her daily activities.   In doing so, the ALJ mischaracterized Thompson's own testimony about her daily activities, then claimed that the testimony was inconsistent with her complaints of pain.  Thompson testified that she was unable to work because of headaches, memory loss, loss of balance, pain in her back, and depression.  She also stated that she was unable to stand more than five or ten minutes at a time, walk very far or lift much weight.  The ALJ found that Thompson lacked credibility because "the claimant testified that she cooks, washes dishes, makes her bed, grocery shops, waters grass, visits with her grandchildren and attends church," activities which are "not unlike the activities of unimpaired individuals."

These findings misstate the record.   When asked if she made her own bed, Thompson actually replied that she "pull[s] the cover on it." Thompson testified that she microwaves her own meals, but that she does not use the stove because

she drops things and cuts and burns herself if she tries to cook.  Thompson washes dishes "a little," but her chest hurts and burns because of her last two breast surgeries.  Thompson's aunt takes her to church once or twice a month, but she cannot stay for the entire service because the benches are too hard. Thompson testified, "And when I feel kind of good, I go outside and maybe water the grass. Then back in the house pretty much, unless my sister or somebody comes by, and I go over to their house for a little while, or my son will get me and take me to see the grandkids."  The ALJ erroneously determined that Thompson is not disabled merely because she attempts to perform activities that an unimpaired individual might engage in on a regular basis.  As the Eighth Circuit has noted, "a claimant need not spend all of her time in bed or be unable to perform chores to suffer disabling pain."  Miller v. Sullivan, 953 F.2d 417, 421 (8th Cir. 1992).

The ALJ further concluded that Thompson lacked credibility because "the grocery shopping is particularly inconsistent with the claimant's assertion of an inability to walk more than a few steps at a time as well as her assertion of an inability to stand more than five to ten minutes at a time."  Once again, the ALJ did not properly apply the Polaski criteria in rejecting Thompson's claim because her testimony was not inconsistent with her stated limitations.  Thompson testified that she has to take a break when walking up stairs because she gets tired and her

chest starts beating fast. She further stated that she cannot walk very far, and that she needs to take water with her and rest if she walks to her mailbox and back. Thompson estimated that she can only stand for about five minutes. In response to a question from her attorney, Thompson did state that she goes shopping, but she also testified that she needs someone else to drive her and carry her heavy packages. Thompson was not questioned about how often she goes shopping, whether she takes breaks while shopping, or even whether she uses a motorized cart while at the store. Although the ALJ asked Thompson a couple of questions about her daily activities, he never asked her to provide any details about her shopping trips. Therefore, there was no evidence in the record about whether Thompson even walks or stands at all while at the store. The ALJ has a duty to develop the record fully and fairly and should have questioned Thompson on this issue if he felt that her credibility rested on whether she walks unassisted and without breaks while shopping. See Miller, 953 F.2d at 422. Under these circumstances, it was improper for the ALJ to conclude that Thompson's daily activities conflicted with her allegations of pain without any supporting evidence.

In considering Thompson's description of her pain, the ALJ chose to contrast Thompson's complaints of frequent headaches and pain with a single notation in a record of Raj Sindwani, M.D., that Thompson "describes some

lightheadedness and headache, which is intermittent." Based on Sindwani's

notation and the fact that Thompson's primary analgesic was Naproxen (which can

be obtained over the counter), the ALJ concluded that "the implication is that

symptoms have not been so intense or frequent as to be disabling." The ALJ erred

in discounting Thompson's subjective complaints of pain merely because one

doctor described Thompson's headaches and lightheadedness as "intermittent" on

one occasion. Thompson was being evaluated by Sindwani for "left neck and ear

pain" in 2003, not for headaches. Sindwani's report even notes that Thompson

"was seen by a neurologist recently for headache." In fact, Thompson was being

treated by Leacock and Randolph for headaches, both before and after her

evaluation by Sindwani. Randolph noted as late as 2004 that he had been treating

Thompson for headache and dizziness (among other problems) since 2002, that

she was on several medications in addition to Naproxen, and that her "medication

varies." Under these circumstances, it was error for the ALJ to discount

Thompson's testimony about the frequency and severity of her pain based on the

notation in Sindwani's report (particularly where more recent medical records

from Thompson's regular treating physician corroborate Thompson's complaints)

and the fact that Naproxen is her primary pain medication among several

medications.

The record reveals that the ALJ failed to produce substantial evidence discrediting Thompson's subjective allegations of pain. The ALJ improperly applied Polaski by misstating Thompson's testimony, making assumptions about her daily activities without any evidence in the record to support his conclusions, and ignoring medical evidence from Thompson's regular treating physician which supported her testimony. In doing so, the ALJ erred.

Thompson contends that the ALJ also erred by not ordering additional psychological testing of Thompson. In this case, Thompson was evaluated by two consultative examiners regarding her mental impairments. The first, Dr. Harris, concluded that Thompson suffered from a major depressive disorder of chronic to moderate severity, a pain disorder with psychological factors, marked global memory deficits relative to the average adult, and seriously impaired global functioning. The ALJ accorded these test results only minimal weight, however, because Harris noted that Thompson's "variable effort and negativistic response set made it difficult to discern her level of impairment." The ALJ therefore concluded that this comment meant that Harris "made opinions even though, by his own report, accurate opinions could not be rendered."

The ALJ also gave minimal weight to the findings of the second state consultative examiner, Dr. Cottone, because he believed that Cottone "essentially

relied on Dr. Harris' report to find that the claimant had moderate limitations in numerous mental arenas." Cottone concluded that Thompson showed signs of affective disorder, specifically, depressive syndrome characterized by appetite disturbance with a change in her weight, sleep disturbance, and difficulty concentrating, as well as a somatoform disorder in the form of a pain disorder. Cottone also found her to have a moderate degree of limitation in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. It was noted that Thompson had one or two episodes of decompensation, each of extended duration, and that she had a history of head surgery for a left middle cerebral artery aneurysm. Thompson's effort during the examination was noted as inconsistent and variable. Cottone's report notes that Thompson has an oppositional disposition which accounts for a portion of her poor performance rather than just memory problems per se. Although Cottone could not rule out malingering, he noted that Thompson is forgetful and should be limited to simple work. Cottone concluded that some restriction in work-related social interaction was necessary for Thompson.

Despite this evidence, the ALJ concluded that Thompson "has had no restrictions of activities of daily living, no difficulties maintaining social functioning, no episodes of decompensation, and only mild-to-moderate

difficulties maintaining concentration, persistence and pace." This finding is contrary to the reports submitted by the consultative examiners. The ALJ cites the results of a mini-mental status examination performed by a treating neurologist, Dr. Leacock, in April of 2002 as support for his finding, but even Leacock's records are not consistent with the ALJ's determination of Thompson's limitations. Despite Thompson's score of 27-28/30 on the mini-mental status examination administered during her initial visit, Leacock still diagnosed her with cognitive slowing and memory loss. In his assessment, Leacock noted that he had none of Thompson's medical records available for review, and that he wanted to obtain her records and then schedule a follow-up visit in four to six weeks. Leacock's report does not support the ALJ's finding that Thompson had "no restrictions of activities of daily living," and it was error for the ALJ to reach this conclusion based on this evidence. This is particularly true because the record includes reports from two consultative psychiatrists who, after examining Thompson more than a year after Leacock administered the mini-mental status examination, opined that Thompson suffers from mental impairments. The ALJ cites no medical evidence (other than the results of Leacock's mini-mental exam) to support his findings. Under these circumstances, the ALJ erred by ignoring the medical evidence of record and substituting his own opinions regarding

Thompson's limitations.

Moreover, the ALJ failed to adequately explain why he discounted the opinions of the consultative examiners. The ALJ afforded Harris's report only minimal weight because he concluded that Harris's opinions could not be accurate. Yet there is nothing in Harris's report to indicate that Harris was unable to complete his evaluation of Thompson or that he believed his assessment was inaccurate because of Thompson's variable effort and negativism during testing. In fact, Harris concluded that Thompson "suffers from some memory, attention and concentration deficits" as well as "many symptoms of depression and anxiety." Similarly, the ALJ discounted the opinions of the second consultative examiner (Cottone) because he believed that Cottone "essentially relied on" Harris's report. While Cottone's records demonstrate that he reviewed Harris's report in connection with his evaluation of Thompson, there is no indication that Cottone relied solely, or even primarily, on this evidence in reaching his conclusions. Moreover, Cottone's reliance upon Harris's report does not render Cottone's opinions unreliable for the reasons stated above.

The ALJ has a duty of fully and fairly developing the facts of the case, even when the claimant is represented by counsel. Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990). If the ALJ believed that he lacked sufficient medical

evidence to determine whether Thompson was disabled or that the results of the consultative examinations were incomplete or inaccurate, he should have ordered additional psychological testing instead of merely substituting his own opinion about Thompson's mental impairments for that of the physicians'. Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of Thompson's claim in light of all medical records on file and development of any additional facts as needed. The Commissioner should reevaluate Thompson's physical and mental impairments and complaints in accordance with <u>Polaski</u> and order additional consultative examinations, if necessary, to determine Thompson's nonexertional limitations.

Finally, Thompson argues that the ALJ committed error by failing to have a vocational expert testify at her hearing. Thompson asserts that this testimony is required because of her nonexertional impairments of memory problems, pain, headaches, and depression. Because I am remanding this matter to the Commissioner for further proceedings, I leave it to the ALJ to decide whether testimony from a vocational expert is required for rehearing. The Commissioner correctly notes that the ALJ may rely on the Medical Vocational Guidelines instead of a vocational expert, even if there are nonexertional impairments, if the

ALJ finds, and the record supports the finding, that the nonexertional impairments do not diminish claimant's residual functional capacity to perform a full range of activities listed in the Guidelines. <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997). Given that the ALJ erred in his consideration of Thompson's nonexertional impairments, it seems likely that the ALJ will require testimony from a vocational expert upon remand to properly evaluate Thompson's claim. However, I leave it to the ALJ to decide this issue upon remand.

I find that the ALJ did not fulfill his duty of fully and fairly developing the record and properly evaluating the evidence presented. As a result, I cannot conclude that there is substantial evidence on the record as a whole to support the ALJ's decision. Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order. <u>See</u> <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this <u>13th</u> day of March, 2007.